**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| JERRY PHILIPP & MARCIA PHILIPP, | : | |
| | : | |
| Plaintiffs | : | |
| | : | Civil Action No.: |
| v. | : | |
| | : | |
| SOLVAY SPECIALTY POLYMERS, | : | JURY TRIAL DEMANDED |
| USA, LLC; SOLVAY SOLEXIS, INC.; | : | |
| ARKEMA, INC.; E.I. DU PONT DE | : | |
| NEMOURS & COMPANY; THE | : | |
| CHEMOURS COMPANY; THE | : | |
| CHEMOURS COMPANY FC, LLC; THE | : | |
| 3M COMPANY; ABC CORPORATIONS | : | |
| #1-10, and DOE DISCHARGERS #1-10 | : | |
| | : | |
| Defendants | : | |

**COMPLAINT**

Now come Plaintiffs, Jerry Philipp and Marcia Philipp (collectively "Plaintiffs"), by and through their undersigned counsel, and for their Complaint against Defendants, Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc., Arkema, Inc., E.I. du Pont de Nemours & Company, The Chemours Company, The Chemours Company FC, LLC, The 3M Company, ABC Corporations #1-10, and Doe Dischargers #1-10 (collectively "Defendants") allege as follows:

## NATURE OF ACTION

1. This is a civil action for compensatory and punitive damages, including medical monitoring and biomonitoring, and costs incurred and to be incurred by Plaintiffs arising from the intentional, knowing, reckless, and negligent acts and omissions of Defendants, which resulted in the contamination of Plaintiffs' private water supply. The contamination was caused by the Defendants' intentional manufacturing, use,

1

discharge, and/or disposal of poly- and perfluoroalkyl substances ("PFAS"), including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX".

## PARTIES

2. Plaintiff Jerry Philipp is an adult citizen of the State of New Jersey domiciled at 304 Pedricktown Road, Logan Township, NJ 08085.

3. Plaintiff Marcia Philipp is an adult citizen of the State of New Jersey domiciled at 304 Pedricktown Road, Logan Township, NJ 08085.

4. Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.  As a limited liability company Solvay USA's citizenship is determined by the citizenship of each of its members.  See, e.g., Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010).  Upon information and belief based upon a search of publicly available sources, Solvay USA's sole member is Ausimont Industries Inc. ("Ausimont"), a Delaware corporation.  Ausimont is a holding company with no operations.  Its headquarters, president, and one of its board members are based in Houston, Texas.  Accordingly, Ausimont's principal place of business if Houston, Texas.  See, e.g., Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010); Johnson v. Smithkline Beecham Corp., 724 F.3d 337, 347 (3d Cir. 2013).  Thus, Ausimont is a citizen of Delaware and Texas.  Solvay USA, in turn, is also a citizen of Delaware and Texas.  Neither Solvay USA nor Ausimont are citizens of the same state as the Plaintiffs.

5. Based upon representation of counsel, Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

6. Defendants Solvay USA and Solvay Solexis will collectively be referred hereinafter as "Solvay".

7. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, PA 19103.

8. Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805.

9. Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.

10. Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company.  Chemours FC's sole member is Chemours Co.  As alleged above, Chemours Co. is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.  Thus, Chemours FC is a citizen of Delaware.

11. Defendants Chemours Co. and Chemours FC will collectively be referred hereinafter as "Chemours".

12. Defendant The 3M Company ("3M") is a corporation duly organized under the laws of the State of Minnesota with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

13. Defendants ABC Corporations #1-10 are fictitious entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter or which are otherwise liable for the causes of action set forth herein.

14. Defendant Doe Dischargers #1-10 are fictious names for entities whose identities are presently unknown and who were responsible for discharged hazardous substances and pollutants into the groundwater and environment resulting in contamination to the Plaintiff's property.

## JURISDICTION AND VENUE

15. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that none of the Plaintiffs is domiciled in the same state as any Defendant, and the amount in controversy exceeds $75,000.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

I.   **Poly- and perfluoroalkyl Substances ("PFAS")**

17. Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals manufactured and used in the United States since the 1940s.

18. PFAS have fire-resistant properties and act as oil, grease, and water repellants.

19. They have been used to make numerous household products like Stainmaster®, Scotchgard®, Teflon®, Gore-Tex® and Tyvek®.

20. They have long been used in aqueous film-forming foam ("AFFFs") used to fight fires.

21. There are literally thousands of PFAS compounds including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS").

22. 3M has been identified by the United States Environmental Protection Agency ("EPA") as the dominant global producer of PFOA and related chemicals manufacturing at least 85% of total worldwide volumes.

23. PFAS compounds constitute a substantial threat to human health and the environment.

24. Some PFAS are classified as carcinogenic.

25. Studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

26. PFAS compounds are extremely resistant to degradation and thus persist indefinitely in the environment.

27. PFAS compounds bioaccumulate resulting in the buildup of these toxins in living tissue.

28. People who consume these substances through drinking water and other means accumulate increasing concentrations of PFAS in their blood.

29. Defendants and their predecessors in interest have understood the toxic characteristics of PFAS for decades.

30. Regulatory agencies around the world are only just beginning to understand the true nature and dangers of these contaminants.

31. The New Jersey Department of Environmental Protection ("NJDEP") has and is continuing to expend tremendous resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

32. Replacement chemicals including but not limited to "GenX" have been substituted by Defendants in place of their PFAS chemicals.

33. These replacement chemicals are being touted as short-chain and having shorter half-lives.

34. However, these replacement chemicals may have similar toxicity.

35. These replacement chemicals do not break down in the environment and have also been detected in drinking water, groundwater and surface waters.

36. EPA has identified PFAS as "emerging contaminants," which are currently unregulated at the federal level.

37. In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

38. In 2016, EPA reduced its advisories for PFOA and PFOS to 70 ppt collectively total.

39. In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk

levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

40. NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

41. NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

42. On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

43. On March 31, 2020, the NJDEP adopted a PFOA MCL of 14 ppt and a PFOA groundwater quality standard of 14 ppt.

44. NJDEP has added PFOA and PFOS to the List of Hazardous Substances.

45. NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc., Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiffs.  Attached hereto as Exhibit A is a true and correct copy of the NJDEP Directive.

II.    **Solvay and Arkema's West Deptford Facility**

46. Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 ("the site" or "the West Deptford Facility") from 1990 to present.

47. Arkema owned and operated the West Deptford facility prior to 1990.

48. The site comprises  243-acres, and is an agricultural and industrial area bounded by a railroad line to the south.

49. The site is bordered on the west by the Delaware River.

50. The site was used for agricultural purposes prior to 1970.  In 1970, Pennwalt constructed a fluorocarbon manufacturing facility on the former farmland.  In 1977, manufacturing ceased until a new manufacturing facility was constructed from 1983 to 1985.

51. The new manufacturing facility built by Arkema produced industrial plastics and coatings, Kynar® (a fluoropolymer), hydrochlorofluorocarbon ("HCFC") gases, and polyvinylidene fluoride ("PVDF").  Arkema also began using Surflon®, a chemical mixture comprised of PFNA, perfluoroundecanoic acid ("PFUnDA" or "PFUnA"), PFOA and other PFAS compounds, in its manufacturing processes in 1985.

52. In October 1990, Arkema sold the facility to Solvay which continued to use PFAS compounds since that time and continues to use PFAS compounds at the Site today.

53. Manufacturing processes, discharges, emissions, and waste disposal practices at and from the Site have caused widespread soil, sediment, groundwater, and surface water contamination both on and off-Site, including PFNA and PFOA.

54. From approximately 1990 to 2012, Solvay manufactured polyvinylidene fluoride ("PVDF") at this facility, which is a specialty plastic that is utilized in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

55. During most of this time, Surflon S-111 was used in the manufacturing process of PVDF.  Surflon S-111 is composed of 79% PFNA.

56. Solvay's West Deptford facility was considered to have the second highest capacity in the world for purposes of using Surflon S-11 to make PVDF.

57. As a result of their operations, Solvay released massive amounts of PFNA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFNA chemical.

58. Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to them by 3M.

59. NaPFO degrades into PFOA.

60. As a result of their operations, Solvay released massive amounts of PFOA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA chemical.

61. Currently, Solvay is using a replacement chemical for PFNA for use in the manufacture of its polyvinylidene product. This compound, identified in Wang, 2013, as "Solvay's product (CAS no. 329238-24-6)" is a chloral perfluoro polyether carboxylate and has been identified in environmental matrices in Salem and Gloucester Counties.

62. According to an article published in Science 2020 some of these replacement

products are likely ClPFPECA congeners and have been identified in the soils in areas surrounding Solvay, including area to the north and east.[1]

63. Defendants knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment.

64. Defendants Solvay knew that it was discharging large amounts of PFNA into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086 since at least 1991.

65. Solvay has reported using 275,730 lbs. of Surflon® at the Site between 1991 and 2010. According to Solvay, 86.6% of the Surflon® used at the Site between 1991 and 2010 was released into the environment through emissions to water and air, including 164,408 lbs. discharged to water and 73,632 lbs. emitted to the atmosphere.

66. Solvay has reported using 23,241 lbs. of NaPFO at the Site between 1995 and 2003. According to Solvay, approximately 97% of the NaPFO used at the Site between 1995 and 2003 was released into the environment through emissions to water and air, including 20,682 lbs. discharged to water and 1,861 lbs. emitted to the atmosphere.

67. On-site and off-site groundwater sampling has revealed PFNA concentrations of up to 482,000 ppt and PFOA at concentrations of up to 16,2000 ppt.  PFNA and PFOA were also detected in samples taken from off-Site monitoring wells. For example, Solvay detected PFNA at a concentration of 2,680 ppt at an off-site well approximately 1.3 miles from the Site.

---

[1] Washington et al., Science 368, 1103–1107 (2020) 5 June 2020, "Nontargeted mass-spectral detection of chloroperfluoropolyether carboxylates in New Jersey soils"

68. Quarterly sampling of several neighboring public water systems including West Deptford, East Greenwich, Greenwich and Paulsboro have PFNA concentrations, some as high as 150 ppt in Paulsboro and 120 ppt in Woodbury.

69. Samples of surface water, sediment and pore water from the Delaware river revealed detection of PFNA and PFUnDA in more than half of the sampled locations.

70. Testing of its effluent discharges to the Delaware river has revealed PFNA discharges as high as 14,000 ppt and concentrations of PFOA as high as 1,600 ppt.

71. In 2009-2010, a study involving 20 out of New Jersey's 21 counties revealed 70% of sampled drinking water sources having between one to eight PFAS compounds.  In the samples tested, PFNA was detected up to 96 ppt.

72. NJDEP sampled 992 private wells as of June 2018 for PFAS.

73. 400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

74. Out of those 400 sampled wells, 83 wells (21%) required the installation of a point of entry treatment ("POET") system for PFNA or perfluorooctanoic acid ("PFOA")

75. Prior to 1990, as a result of their operations, Arkema released massive amounts of PFOA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA chemical.

### III. **DuPont and Chemours' Chamber's Works Facility**

76. DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey from 1891 to 2015.

77. DuPont produced, utilized, and discharged into the environment approximately 1,200 chemicals, pollutants, and other hazardous substances from the Chambers Works facility.

78. PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

79. Telomers were also used and manufactured at Chambers Works.  PFOA is a by-product of the telomer manufacturing process.

80. 3M supplied DuPont with PFOA.

81. DuPont also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this waste along with wastewater from its on-site PFOA-related processes through its wastewater treatment plant.

82. As a result of their operations, DuPont released massive amounts of PFOA as well as other PFAS, including PFNA, from Chambers Works for decades into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources.

83. In 2015, DuPont transferred its Chambers Works facility to Chemours, but continued to operate at the location pursuant to an industrial lease (whereby DuPont was the tenant and Chemours FC was the landlord).

84. Chemours accepted the transfer of DuPont's Chambers Works facility knowing that the site was contaminated with PFAS and that it was discharging PFAS into the

surrounding air and water contaminating off-site properties including Plaintiffs', and New Jersey's natural resources.

85. Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with 168 out of 341 wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined.

86. NJDEP recently declared that:

"it has recently become clear that DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

87. NJDEP further alleges that by doing so "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

88. DuPont and 3M committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

89. Such conduct was performed to promote sales of their products and to reduce or eliminate expenses they would have otherwise incurred to remediate the discharge of PFAS into the environment and Plaintiffs' private well.

IV.   **Defendants' Contamination of Groundwater and Drinking Water**

90. Defendants knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment.

91. Defendants collectively failed to maintain adequate pollution control equipment, failed to design and maintain manufacturing equipment and processes to minimize discharges to the environment and negligently disposed and/or stored waste generated by their manufacturing operations.

92. Defendants collectively had longstanding awareness of the chemicals toxicity but suppressed such knowledge in a deliberate effort to avoid regulation.

93. Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies from as early as the 1970s.

94. Defendant 3M knew that PFAS could leach in groundwater and contaminate the environment.

95. As early as 1960 an internal 3M memo admitted to understanding that its chemicals "[would] eventually reach the water table and pollute domestic wells."

96. 3M actively sought to suppress scientific research on the hazards associated with PFAS products and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and economical risks of its PFAS products.

97. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

98. Defendants DuPont knew that PFOA was toxic to people from studies of its own workers.

99. Defendants DuPont knew that PFOA was being discharged into the environmental but failed to disclose the risks to regulators or the public.

100. In a 2003 report on Chambers Works, DuPont disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt but characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

101. Defendants Solvay knew that it was discharging large amounts of PFNA into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086 since at least 1991.

102. In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water, which revealed 65% of sampled drinking water sources having PFOA compounds present, and 30% having PFOS compounds present.

103. In 2009-2010, a second study involving 20 out of New Jersey's 21 counties revealed 70% of sampled drinking water sources having between one to eight PFAS compounds.  In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

104. NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

    a.  PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

b.  PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

105. 400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

106. Out of those 400 sampled wells, 83 wells (21%) required the installation of a point of entry treatment ("POET") system for PFNA or PFOA.

107. Plaintiffs are part of the 21% of private wells requiring installation of a POET system due to detection of high concentrations of PFAS in their private water well.

108. Plaintiffs had their private well tested on or about January 19, 2017.  The results yielded a concentration of 22 ppt of PFOA.

109. Plaintiffs' POET system was installed in 2018.

110. Plaintiffs have consumed, ingested, and otherwise been exposed to high concentrations of PFAS due to Defendants' negligent, careless, wrongful, reckless and/or intentional failure to take appropriate steps to prevent and/or reduce the discharge of PFAS into Plaintiff's drinking water.

111. Due to the bioaccumulation properties alleged in the aforementioned paragraphs, Plaintiffs are likely to have accumulated high levels of PFAS in their blood as a result of their long periods of exposure to high concentration of PFAS.

112. Plaintiffs are at risk for serious physical injuries and diseases related to their consumption, ingestion, and exposure to elevated levels of PFAS.

113. Studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to

fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

114. Plaintiffs' increased risk of serious physical injuries and diseases make it reasonably necessary for Plaintiffs to undergo periodic diagnostic medical examinations, including blood testing, different from what would be prescribed in the absence of such exposure.

115. Monitoring procedures exist that make possible the early detection of the latent diseases and other harms referred to in the aforementioned paragraphs.  These procedures necessarily include blood draws and analysis in order to gage the levels of PFAS in Plaintiffs' bodies.

116. The contamination of Plaintiffs' private well has also severely disrupted their lives.

117. They have and will continue to incur substantial costs for bottled water in order to reduce their exposure to the contaminants in their water supply.

118. They have and will be subjected to annoyance, inconvenience and distress in having to make repeated trips to pick up bottled water and use bottled water instead of tap water for such ordinary tasks as cooking, brewing coffee and tea, brushing their teeth, watering their vegetable gardens, and feeding pets.

119. They have and will be subjected to annoyance, inconvenience and distress in having to install and maintain a POET system to treat their contaminated private well.

120. Plaintiffs' property which they own has suffered significant diminished value as a result of the contamination.

## V.   <u>Groundwater Pathways</u>

121. Groundwater is water that exists beneath the Earth's surface.  Groundwater is a

primary source of drinking water for Plaintiffs.

122. Private wells, such as those utilized by Plaintiffs, provide access to groundwater, which then in turn provide drinking water to them.

123. The aquifer system providing potable water to plaintiffs is known as the Potomac-Raritan-Magothy aquifer system, locally referred to as the "PRM" system. The Delaware River flows across of the outcrop of the aquifer system in the vicinity of Camden, Gloucester and Salem counties and is hydraulically connected to the aquifer system.

124. Defendants' facilities are located on the PRM outcrop and outcrops over the Magothy Aquifer.

**A. Groundwaters Pathways from Defendants' Facilities**

125. Hazardous substances and pollutants discharged, released, and/or emitted from the Defendants' facilities have reached and adversely affected groundwater both on and off-site.  Groundwater at the Solvay/Arkema West Deptford Facility and Dupont/Chemours Chambers Works Facility is heavily contaminated with hazardous substances and pollutants, including, but not limited to, VOCs, metals, PFNA, PFOA, and other PFAS compounds.  Discharges, emissions and/or releases of hazardous substances and pollutants at the defendants' facilities have further resulted in contamination of groundwater located underneath neighboring properties and miles away from it, including Plaintiffs' private well.

126.  Due to the tidal nature of the Delaware River and the fact that the Delaware River recharges the upper - Magothy, middle - Raritan, and lower - Potomac aquifer ("PRM aquifer system"), PFAS discharged from defendants' facilities likely migrated both

down river and up river into nearby tributaries, moved horizontally and downward through leaky confining units into the deeper aquifer system, resulting in contamination of the broader aquifer including locations proximal to the Delaware River and tidally influenced tributaries.

127. The PRM aquifer system comprise a hydraulically interconnected system where leakage occurs between the aquifer units and allows for contaminant migration between units. This hydraulic interconnectivity has been extensively documented by the United States Geologic Survey (USGS) and others.

128. Plaintiffs' well accesses groundwater from the PRM aquifer system.

129. Therefore, all or a material part of the PFAS detected in Plaintiffs' private well is attributable to defendants.

## VI.   Surface Water Pathways

130. Surface water includes all water in the State's lakes, streams, and wetlands, and is a primary source of drinking water for residents, including Plaintiffs.

### A. Surface Water Pathway From Defendants' Facilities

131. Hazardous substances and pollutants discharged, released, and/or emitted from defendants' facilities have reached and adversely affected surface waters both on and off-site. Due to the tidal nature of the Delaware River, surface water bodies both upstream and downstream of the defendants' facilities have been adversely affected.

132. The PRM aquifer system outcrops extensively along the Delaware River proximate to defendants' facilities. The Delaware River and its tributaries have been and continue to be a source of recharge to the PRM aquifer system in New Jersey due to the lowering of groundwater levels as a result of the extensive groundwater pumping

for municipal and industrial use over the past several decades.

133. There is extensive documentation in the literature (USGS and New Jersey Geologic Survey (NJGS)) regarding this interconnection between the Delaware River and its tributaries with the underlying PRM aquifer system.

134. The Solvay Facility has discharged very high levels of PFNA and PFOA to the Delaware River. The sampling of the Delaware River and its tributaries proximate to the Solvay Facility has demonstrated levels of PFNA at 265 ppt and PFOA at 11.5 ppt (Maybury, Stephen, NJDEP May 2017).

135. This contamination has spread into upstream and downstream reaches of the river and its tributaries due to the tidal nature of the Delaware River and its tributaries.

136. According to the NJDEP, from 1917 through the 1980s, process waste generated at Chambers Works was disposed of through a series of open ditches, some of which were unlined. Production buildings had trenches and/or sumps that collected wastewater. Wastewater then flowed into a drainage ditch adjacent to the buildings, where it would be combined with wastewater from other buildings. Most wastewater then continued through a network of ditches into a settling basin, which ultimately discharged to the Delaware River. Some buildings at the exterior of the Chambers Works Facility, however, discharged directly to the Delaware River and the Salem Canal.

137. Improvements were made to this system incrementally over time, including the construction of a wastewater treatment plant and the eventual addition of an overhead sewer system in 1991. Once the overhead sewer system was in place, all process wastewater was conveyed to the wastewater treatment plant.

138. The wastewater contained PFOA and PFOS in the parts per million.

139. DuPont also accepted commercial waste streams that contained PFOA and other PFAS until 2012.

140. Therefore, this interconnection between the Delaware River and its tributaries with the PRM aquifer system provides a direct pathway for contaminant migration from surface water to groundwater and toward the private well of Plaintiffs' which are proximate to the Delaware River and/or its tributaries.

141. Accordingly, multiple pathways establish that PFAS chemicals discharged at and from the Solvay/Arkema West Deptford Facility and from the DuPont/Chemours Chambers Works Facility into surface waters migrated into nearby tributaries, their sediments and then into groundwater distant from the site, including the well providing private water supply to Plaintiffs.

142. Therefore, all or a material part of the PFAS detected in Plaintiffs' private well is attributable to the Solvay/Arkema West Deptford Facility and the from the DuPont/Chemours Chambers Works Facility.

## CLAIMS

### Count I: Negligence
### Plaintiffs v. All Defendants

143. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

144. Defendants knew or should have known that use of PFAS and/or discharge of PFAS into the groundwater and drinking water was hazardous to human health and the environment.

145. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS chemicals into the environment in close proximity to surrounding residential communities, including Plaintiffs'.

146. Defendants DuPont, Chemours, Solvay, Arkema, ABC Corporations #1-10, and Doe Dischargers #1-10 had a duty to take all reasonable measures to ensure that PFAS would be effectively contained and not discharged into the surrounding environment.

147. Defendants DuPont, Chemours, Solvay, Arkema, ABC Corporations #1-10, and Doe Dischargers #1-10 had a duty to operate and manage their facilities and its related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

148. Defendants DuPont, Chemours, Solvay, Arkema, ABC Corporations #1-10, and Doe Dischargers #1-10 further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including Plaintiffs.

149. Defendants DuPont, Chemours, Solvay, Arkema, ABC Corporations #1-10, and Doe Dischargers #1-10 breached the above-stated duties by unreasonably disposing PFAS in a manner that guaranteed it would enter the environment, specifically but not limited to the groundwater, exposing nearby residents who relied upon the groundwater for their drinking water supply, including Plaintiffs.

150. Defendant 3M had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment.

151. Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema,

DuPont, Chemours, ABC Corporations #1-10, and Doe Dischargers #1-10 to avoid discharging PFAS into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

152. As a direct and proximate result of these acts and omission, Defendants contaminated the environment with PFAS, thereby exposing Plaintiffs to these chemicals, and causing injury to them.

153. All Defendants contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

154. The acts and omissions of Defendants were negligent, and as a result, Plaintiffs have suffered and/or will in the future suffer damage in the form of bodily injury, emotional distress, and/or property damage, all of a type not common to the general public, for which Defendants are liable, including, liability for all medical monitoring relief required and requested by Plaintiffs.

## Count II: Gross Negligence
## Plaintiffs v. All Defendants

155. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

156. At all relevant times, Defendants, as detailed above, committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

157. Specifically, Defendants caused, permitted, and allowed the release of PFAS into the environment, thereby contaminating the drinking water of Plaintiffs, constituting an entire want of care and a conscious indifference to the rights, welfare, safety, and

health of Plaintiffs, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

158. Such conduct was performed to promote sales of their products and to reduce or eliminate expenses they would have otherwise incurred to remediate the discharge of PFAS into the environment and Plaintiffs' private well.

159. Defendants' grossly negligent conduct proximately caused and continues to proximately cause damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFAS and/or other human illnesses or diseases) and property damage, in addition to creating conditions harmful to human health and the environment.

160. All Defendants contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

161. Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiffs and an attendant reckless indifference to their health, safety, and welfare.

162. Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiffs so as to warrant the imposition of punitive damages.

### Count III: Private Nuisance
### Plaintiffs v. Solvay, Arkema, DuPont, Chemours, ABC Corporations #1-10, & Doe Dischargers #1-10

163. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

164. Defendants acts and omissions with respect to the release of PFAS in the environment resulted in the contamination of Plaintiffs' private water supply, and have thus unreasonably interfered with Plaintiffs' use and enjoyment of their property, invading Plaintiffs' homes and bodies, making Plaintiffs' water supply unfit for consumption and other domestic purposes, and placing Plaintiffs at an increased risk of developing serious latent diseases and conditions.

165. The contamination of Plaintiffs' private well has materially diminished the value of their properties.

166. Defendants' unreasonable interference with the use and enjoyment of Plaintiffs' properties constitute a continuous invasion of their property rights.

167. As a direct and proximate result of the acts and omissions of Defendants as alleged in this Complaint, Plaintiffs have incurred and will incur in the future, annoyance and inconvenience as well as costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their properties, as well as other damaged alleged herein.

168. Defendants, Solvay, Arkema, Dupont, Chemours, ABC Corporations #1-10, and Doe Dischargers #1-10 all contributed to the contamination of the environment with PFAS, and all subsequently contributed to the private nuisance imposed on Plaintiffs.

169. Defendants' creation of a continuing private nuisance has damaged Plaintiffs in the form of bodily injury, emotional distress, and/or property damage all of a type not common to the general public, for which Defendants are liable, including liability for all appropriate medical monitoring relief required by Plaintiffs.

**<u>Count IV: Past and Continuing Trespass</u>**

**Plaintiffs v. Solvay, Arkema, DuPont, Chemours, ABC Corporations #1-10, and Doe Dischargers #1-10**

170. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

171. Plaintiffs are owners and/or residents of real property with the right of possession.

172. Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS resulting in its discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiffs to possess and enjoy their properties.

173. Plaintiffs have not consented and do not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiffs would not consent to such.

174. Defendants, Solvay, Arkema, Dupont, Chemours, ABC Corporation #1-10, and Doe Dischargers #1-10 all contributed to the contamination of the environment with PFAS, and all subsequently contributed to the past and continuing trespass imposed on Plaintiffs.

175. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water well on Plaintiffs' properties have been contaminated with PFAS, causing significant property damage, including actual, consequential, and nominal damages.

**Count V: Spill Act**
**Plaintiffs v. All Defendants**

176. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

177. Defendant Solvay USA is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

178. Defendant Solvay Solexis is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

179. Defendant Arkema is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

180. Defendant DuPont is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

181. Defendant Chemours Co. is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

182. Defendant Chemours FC is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

183. Defendant 3M is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

184. Defendants ABC Corporations #1-10 are "persons" within the meaning of N.J.S.A. § 58:10-23.11b.

185. Defendants Doe Dischargers #1-10 are "persons" within the meaning of N.J.S.A. § 58:10-23.11b.

186. The discharge of hazardous substances is prohibited pursuant to N.J.S.A. § 58:10-23.11c.

187. The contaminants discharged from the West Deptford facility and Chambers Works are hazardous substances as defined in N.J.S.A. § 58:10-23.11b.

188. A person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. § 58:10-23.11g.

189. Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.  N.J.S.A. § 58:10-23.11f(a)(2)(a).

190. Plaintiffs have incurred, and will continue to incur, costs and damages associated with the discharges of the aforementioned sites and which are "cleanup and removal costs" within the meaning of N.J.S.A. § 58:10-23.11b including but not limited to restoration of a clean water supply and/or providing them with access to an alternate water source.

191. Defendant Solvay USA as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

192. Defendant Solvay Solexis as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

193. Defendant Arkema as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

194. Defendant DuPont as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

195. Defendant Chemours Co. as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without

regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

196. Defendant Chemours FC as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

197. Defendant 3M as manufacturers and suppliers of the hazardous substances discharged at the West Deptford and Chambers Works facilities, are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of their hazardous substance products.

198. Defendants ABC Corporations #1-10 as the owners and/or operators of the West Deptford and Chambers Works facilities, and/or the manufacturers and/or suppliers of the hazardous substance products are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of their hazardous substances at their facility and/or hazardous substance products.

199. Defendants Doe Dischargers #1-10 as the owners and/or operators of the West Deptford and Chambers Works facilities, and/or the manufacturers and/or suppliers of the hazardous substance products are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of their hazardous substances at their facility and/or hazardous substance products.

200. As a direct or indirect result of the violations set forth above, Plaintiffs have incurred and will incur in the future substantial costs related to the restoration of a clean water supply and/or access to an alternate water source.

## Count VI: Strict Liability (Abnormally Dangerous Activities)
## Plaintiffs v. Solvay, Arkema, DuPont, Chemours, ABC Corporations #1-10, and Doe Dischargers #1-10

201. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

202. At all relevant times, Defendants Solvay, Arkema, DuPont, Chemours, ABC Corporations #1-10, and Doe Dischargers #1-10 disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

203. As a result of Defendants Solvay, Arkema, DuPont, Chemours, ABC Corporations #1-10 and Doe Dischargers #1-10 discharging such substances from their sites, the groundwater was contaminated with hazardous substances, creating a risk of harm to Plaintiffs as well as the surrounding community.

204. The manufacturing, utilization, disposal, and discharge of PFAS chemicals constitute abnormally dangerous activities that introduce an unusual danger in the community.

205. These activities presented a high likelihood that the harm they would cause would be great.

206. The manufacturing, utilization, disposal, and discharge of these products are not matters of common usage in the areas where these activities were carried out.

207. At all relevant times, the risk of the Defendants abnormally dangerous activities outweighed the value to the community.

208. Defendants acts and omissions in manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiffs' properties, making them strictly liable for the harm caused by such contamination.

209. Defendants Solvay, Arkema, Dupont, Chemours, ABC Corporations #1-10 and Doe Dischargers #1-10 all contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

210. As a direct and proximate result of Defendants discharges of hazardous substances and contaminants, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value, deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

## Count VII: Strict Liability (Failure to Warn)
## Plaintiffs v. 3M

211. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

212. Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied PFAS products for sale and sold such products to Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 in the ordinary course of their businesses.

213. Upon information and belief, Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 utilized the PFAS chemicals supplied by Defendant 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

214. The PFAS products sold by Defendant 3M were unreasonably dangerous to residents of surrounding communities, including Plaintiffs, without adequate warnings and instructions to prevent discharge of PFAS into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs.

215. Defendant 3M knew or should have known that the PFAS products they sold would be discharged into the environment and cause contamination of the water supply of and accumulation in the blood serum of residents living in the surrounding communities, including Plaintiffs.

216. Defendant 3M failed to advise Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10 which were purchasers and users of their PFAS products about the risks their PFAS products posed to foreseeable third parties, such as Plaintiffs, and about techniques that could be employed to reduce these risks.

217. Defendant 3M had actual knowledge of the health hazards associated with PFAS exposure through both animal studies conducted by researchers employed or contracted by such Defendants and though experience with Defendant's own workers, but, upon information and belief, failed to share such information with purchasers of their products, including Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10, or with governmental agencies.

218. Defendant 3M acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS products were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiffs.

219. Defendant 3M had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment.

220. Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10, to avoid discharging PFAS into the

environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

221. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value, deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

### Count VIII: Strict Liability (Defective Design)
### Plaintiffs v. 3M

222. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

223. Defendant 3M designed, manufactured, and sold PFAS that were used at the Chambers Works and West Deptford by Defendants DuPont, Chemours, Solvay, Arkema and ABC Corporations #1-10.

224. As a manufacturer and seller of PFAS, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

225. Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiffs.

226. Defendant 3M's PFAS products were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

227. Defendant 3M knew or should have known that use of its PFAS products by Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 would result in the spillage, discharge, and/or release of PFAS into the environment and would contaminate the groundwater and drinking water of surrounding communities, including Plaintiffs'. Accordingly, Defendant 3M knew or should have known that its PFAS products would eventually come into contact with residents in surrounding communities, including Plaintiffs.

228. Defendant 3M's PFAS products were defective in design and unreasonable dangerous because, among other things:

    a. PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

    b. PFAS contamination in the environment and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiffs, poses significant threats to their health, safety, and welfare.

229. At all relevant times, Defendant 3M's PFAS products which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

230. The foreseeable risk to public health and welfare, including that of Plaintiffs', posed by Defendant 3M's PFAS products outweighed the cost to Defendant 3M of reducing or eliminating such risk.

231. Defendant 3M knew or should have know about reasonably safer and feasible alternatives to PFAS.

232. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value, deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

## DEMAND FOR JURY TRIAL

233.     Plaintiffs hereby demand trial by jury on all issues set forth herein.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand judgement against Defendants, jointly and severally, and asks the Court to provide the following relief:

a)   An award of general, compensatory, and exemplary damages;

b)   An award of interest, costs, and reasonable attorneys fees as are allowed by law;

c)   Medical monitoring;

d)   Biomonitoring;

e)   Punitive damages;

f)   Removal of the discharged hazardous substances;

g)   Compelling Defendants to pay for the costs of providing Plaintiffs with a water supply free of hazardous contamination; and

h)   All such other relief that this Court deems just and equitable.

**WILLIAMS CEDAR, LLC**

Dated: April 19, 2021                     /s/ *Alan H. Sklarsky*

Alan H. Sklarsky, Esquire

/s/ *Shauna L. Friedman*

35

Shauna L. Friedman, Esquire

## <u>CERTIFICATION PURSUANT TO L. Civ. R. 11.2</u>

Undersigned counsel certifies that the following actions are pending involving the same subject matter of this controversy:

1. <u>Giordano, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No. 1:19-cv-21573;

2. <u>Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No. 1:20-cv-6906;

3. <u>Bond, et al., v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:20-cv-8487;

4. <u>Slusser, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:20-cv-11393

5. <u>Lombardo, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:20-cv-15014

6. <u>Briggs, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:21-cv-9699

7. <u>Lloyd, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:21-cv-9705

8. <u>Britton, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:21-cv-9707

9. <u>Gouse, et al. v. Solvay Specialty Polymers, USA, LLC, et al.</u> – Civ. Action No.: 1:21-cv-9711

Undersigned counsel further certifies that there are no additional known parties who should be joined to the present action at this time.

I certify the foregoing to be true and I am aware that if any of the above is willfully false, I am subject to punishment.

WILLIAMS CEDAR, LLC

Dated: April 19, 2021

/s/ Alan H. Sklarsky

Alan H. Sklarsky, Esquire

*/s/ Shauna L. Friedman*

Shauna L. Friedman, Esquire